[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 13-11972; 13-15726
Non-Argument Calendar
_____

D.C. Docket No. 9:11-cv-81357-KLR


WILLIAM MOBLEY,

Plaintiff-Appellant,

versus

PALM BEACH COUNTY SHERIFF DEPARTMENT, et al.,

Defendants,

D/S JASON BRONSON,
#7869,
LT. RICHARD BURDICK,
#2847
SGT. KEVIN L. CLAPP,
#4346,
D/S EDWARD ELLIOTT,
#7608,
D/S ANTHONY JOHNSON,
#7928, et al.,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(April 15, 2015)

Before ED CARNES, Chief Judge, TJOFLAT and JORDAN, Circuit Judges.

PER CURIAM:

William Mobley, a Florida inmate proceeding pro se, appeals the grant of summary judgment on his 42 U.S.C. § 1983 claim of excessive force during an arrest. He also appeals the district court's dismissal of his complaint.

I.

We state the facts in the light most favorable to Mobley. See Gilmore v. Hodges, 738 F.3d 266, 272 (11th Cir. 2013) (on review of summary judgment we "draw[] all inferences and view[] all of the evidence in [the] light most favorable to the nonmoving party."). In that light, they are these: On December 12, 2007, Mobley was parked in a West Palm Beach convenience store parking lot, slouched down in the driver's seat of his truck, preparing to smoke crack cocaine. In response to "complaints of high volumes of drug activity" in the area, Deputy Sheriff Jason Bronson of the Palm Beach County Sheriff's Office was on bicycle patrol with his partner. Bronson, who was in uniform, approached the truck after noticing that it was parked in a handicapped spot and not displaying a handicapped

2

placard.  Mobley did not see Bronson approaching his truck, and from his slouched position in the driver's seat, was unable to see anything that identified Bronson as a police officer.  Bronson asked "What are you doing?"  Mobley, fearing that he was being "robbed again," dropped his pipe and keyed his truck's ignition.  As Mobley was trying to start his truck, Bronson reached through the open driver's side window, grabbed Mobley's shoulder, and tried to open the door.  While Bronson was still holding onto him, Mobley backed quickly out of the parking space.  In the process of escaping, Mobley struck Bronson with his truck and dragged him approximately 20 feet across the parking lot before Bronson fell clear of the truck.

Mobley fled the parking lot in his truck.  As he was driving away, Mobley saw Bronson standing in the parking lot pointing a pistol at Mobley and saw that Bronson was a uniformed police officer.  Bronson radioed an alert bulletin that included a description of Mobley and his truck.  He stated that Mobley had struck him with the truck, tried to run him over, and fled the scene.

Mobley drove a few blocks away and parked his truck, but a few moments later a police cruiser arrived.  Mobley again drove away, and the cruiser followed.  By the time Mobley had driven a few blocks several additional cruisers were following him.  Mobley drove recklessly and at high speeds while trying to evade the pursuing police.  While looking back at the police cruisers, Mobley felt his truck run off the road.  He faced forward again in time to avoid striking the trunk

3

of a tree, but the truck struck a tree limb that shattered the windshield and collapsed the truck's roof over the driver's seat.[1] Mobley continued driving a short distance to an open area "out of the traffic" and with "lots of light," where he determined that he would surrender. When he exited his truck (through the passenger door due to the damage on the driver's side), he noticed a small retention pond and — for reasons he asserts are unknown even to him — waded into its center. By the time he was in the middle of the pond, police had surrounded the pond, and a police helicopter was overhead shining its spotlight on him. Mobley waded out of the pond to the waiting police officers on the western bank of the pond, one of whom grabbed him by the hair and shoved him to the ground, pinning him there and ordering him to surrender his hands to be cuffed. While Mobley was on the ground, the officers struck and kicked him, including in the face. The officers' blows broke Mobley's nose, his teeth, and his plastic dental plate.[2] He

---

[1] Mobley contends that the damage caused by the collision was minimal — in particular, that the limb "as he would find out later, bent his driver[']s door frame," but the photograph he introduced in support of his summary judgment opposition clearly shows the collapse of the truck's driver side roof. See Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (holding that the district court did not have to accept the plaintiff's description of his driving where it was "blatantly contradicted by" video from the police car's dash-mounted camera); Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010) ("Where the video obviously contradicts Plaintiff's version of the facts, we accept the video's depiction instead of Plaintiff's account."); see also Feliciano v. City of Miami Beach, 707 F.3d 1244, 1253 (11th Cir. 2013) (plaintiff's testimony can be discounted if it is "blatantly contradicted by the record").

[2] The officers contend that Mobley received some or all of his injuries when his truck struck the tree, but for purposes of summary judgment we resolve this dispute in Mobley's favor. See Gilmore, 738 F.3d at 272.

covered his face with his hands to protect it from the officers' blows.  The officers also tased Mobley repeatedly while he was on the ground.  Mobley eventually gave up, moved his hands from in front of his face and placed them behind his back.  An officer handcuffed him, after which he was given medical attention.

Mobley contends that eight officers were involved, directly or indirectly, in his arrest.[3]  The officers who physically participated in Mobley's arrest were Deputies Elliott, Johnson, and Yoder.  Lieutenant Burdick was present at the scene, but he did not physically assist in making the arrest.  Deputies Bronson, Sheehan, and Moore, and Sergeant Clapp were not present at the scene of the arrest.

Mobley was taken to St. Mary's hospital, where doctors found that he had a broken nose, cuts and bruises along his arms and hands, and broken front teeth.  He later was diagnosed with "Post Traumatic Syndrome" and began suffering seizures. In a state criminal trial arising out of his flight, he was convicted of assaulting Officer Bronson with a deadly weapon and fleeing to elude arrest and was sentenced to 15 years imprisonment.

---

[3] The officers are Deputy Sheriff Jason Bronson, Lieutenant Richard Burdick, Sergeant Kevin Clapp, Deputy Sheriff Edward Elliott, Deputy Sheriff Anthony Johnson, Deputy Sheriff John Moore, Deputy Sheriff Kieran Sheehan, and Deputy Sheriff Scott Yoder.

II.

On December 12, 2011,[4] Mobley — by then an inmate at Wakulla Correctional Institution — filed a pro se civil rights complaint under 42 U.S.C. § 1983 against the Sheriff's Office, Sheriff Ric Bradshaw, and nine Sheriff's Office officers.[5]  He claimed that the police had used excessive force when they arrested him.  ("The beating was unreasonable.  Sadistic, unconstitutional, and criminal.")  In addition to declaratory relief Mobley sought $185,000 in compensatory damages and $625,000 in punitive damages from each defendant. On June 1, 2012, the district court dismissed the claims against the Sheriff's Office and Sheriff Bradshaw under 28 U.S.C. § 1915(e)(2)(B)(ii), leaving only Mobley's claims against the nine officers in their individual capacities.

On November 16, 2012, Mobley filed a proposed amended complaint, seeking to add another defendant whose identity he claimed to have only recently discovered.  The magistrate judge assigned to the case recommended that the

---

[4] The complaint was docketed in the district court on December 16, 2011, but it bears a stamp indicating that it was delivered to Wakulla prison authorities on December 12, 2011. Prisoners' papers are deemed filed when surrendered to prison authorities.  See Houston v. Lack, 487 U.S. 266, 275–76 (1988) (prisoner's notice of appeal deemed filed "at the time petitioner delivered it to the prison authorities for forwarding to the court clerk"); Garvey v. Vaughn, 993 F.2d 776, 783 (11th Cir. 1993) (extending Houston's "mailbox rule" to filing of a pro se prisoner complaint under § 1983).

[5] In addition to the eight officers Mobley alleges were involved in his arrest, the complaint listed a ninth officer, "LT. Byrd," but no such person worked for the Sheriff's Office. Mobley appears to have based "Byrd" on a court reporter's attempted phonetic rendering of Lieutenant Burdick's name during Mobley's criminal trial.

amended complaint be dismissed as time-barred.  On March 15, 2013, the district court adopted the magistrate judge's report and recommendations.  But instead of dismissing the amended complaint, the court's order incorrectly dismissed Mobley's <u>original</u> complaint as time-barred and closed the case.

Mobley appealed that decision on May 2, 2013, seeking reinstatement of his original complaint.[6]  But then on October 1, 2013, the district court <u>sua</u> <u>sponte</u> amended the "scrivener's errors" in its March 15 order, dismissing the <u>amended</u> complaint (instead of the original complaint) and reopening the case.  That same day, the court granted summary judgment to the remaining defendants on qualified immunity grounds.  Mobley then appealed that order.  This is Mobley's consolidated appeal of the March 15 dismissal order and the October 1 summary judgment order.

### III.

The part of Mobley's appeal challenging the district court's dismissal of his original complaint is moot.  An issue becomes moot when it "no longer presents a live controversy with respect to which the court can give meaningful relief." <u>Zinni v. ER Solutions, Inc.</u>, 692 F.3d 1162, 1166 (11th Cir. 2012) (quotation marks omitted), <u>cert.</u> <u>denied</u> 133 S. Ct. 2337 (2013).  We lack jurisdiction to rule on moot

---

[6] In his brief to this Court, Mobley does not seek reinstatement of his proposed amended complaint.  He has thus abandoned the issue.  <u>Sapuppo v. Allstate Floridian Ins. Co.</u>, 739 F.3d 678, 680 (11th Cir. 2014).

questions and instead must dismiss. Soliman v. United States ex rel. INS, 296 F.3d 1237, 1242 (11th Cir. 2002).

After Mobley filed his appeal, the district court sua sponte amended its earlier order so that it dismissed Mobley's proposed amended complaint (instead of the original complaint) and reopened the case, giving him precisely the relief he seeks insofar as the dismissal of his original complaint in the March 15, 2013 order is concerned. The district court's actions since Mobley's first appeal have thus "deprive[d us] of the ability to give the . . . appellant meaningful relief" in that appeal. Soliman, 296 F.3d at 1242 (quotation marks omitted). We will dismiss Mobley's appeal challenging the March 15, 2013 order dismissing his original complaint.

## IV.

That brings us to the October 1, 2013 order granting the defendants summary judgment on qualified immunity grounds and dismissing the amended complaint. We review de novo a grant of summary judgment on the basis of qualified immunity, drawing all inferences and viewing all evidence in the light most favorable to the nonmoving party. Gilmore v. Hodges, 738 F.3d 266, 272 (11th Cir. 2013). The goal of qualified immunity is "to allow officials to carry out discretionary duties without the chilling fear of personal liability." McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009). To obtain qualified immunity, an

8

official such as a police officer must first show he was "act[ing] within his discretionary authority." Morton v. Kirkwood, 707 F.3d 1276, 1280 (11th Cir. 2013). Once an official establishes that his activities were within that scope, the plaintiff must demonstrate (1) that "the facts show that the official violated the plaintiff's constitutional rights" and (2) that "the law clearly established those rights at the time of the alleged misconduct." Id. at 1281. We may address those two inquiries in either order. Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

### A.

Before addressing the first step of the qualified immunity analysis, we need to clarify the factors that a court is to consider when determining whether the facts show that an officer violated the plaintiff's Fourth Amendment right to be free from excessive force during an arrest.

Freedom from unreasonable searches and seizures under the Fourth Amendment "encompasses the right to be free from excessive force during the course of a criminal apprehension." Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009). Even so, the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871–72 (1989). Indeed, "the typical arrest involves some force and injury." Reese v. Herbert, 527 F.3d

9

1253, 1272 (11th Cir. 2008).  We judge excessive force claims "under the Fourth Amendment's objective reasonableness standard."  Crenshaw v. Lister, 556 F.3d 1283, 1290 (11th Cir. 2009) (quotation marks omitted).  That standard asks whether the force applied "is objectively reasonable in light of the facts confronting the officer," a determination we make "from the perspective of a reasonable officer on the scene" and not "with the 20/20 vision of hindsight."  Id. (quotation mark omitted).  We consider factors including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396, 109 S. Ct. at 1872.  We also consider "the need for the application of force, . . . the relationship between the need and amount of force used, and . . . the extent of the injury inflicted."  Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002).

Some of our decisions have held that we should also consider as an additional factor "whether the force was applied in good faith or maliciously and sadistically."  Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008); Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000).  Before 1989 we used a four-factor test to evaluate excessive force claims:  "(1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the extent of the injury inflicted[,] and[] (4) whether the force was applied in good

10

faith or maliciously and sadistically." Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986); see also Byrd v. Clark, 783 F.2d 1002, 1006 (11th Cir. 1986); Gilmere v. City of Atlanta, 774 F.2d 1495, 1501 (11th Cir. 1985); Williams v. Kelley, 624 F.2d 695, 697 (5th Cir. 1980).[7]

In 1989, however, the Supreme Court held that the test for excessive force during an arrest is objective reasonableness under the Fourth Amendment. Graham, 490 U.S. at 397, 109 S. Ct. at 1872.  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id.  As a result, the Court held that "consideration of whether the individual officers acted in 'good faith' or 'maliciously and sadistically for the very purpose of causing harm[]' is incompatible with a proper Fourth Amendment analysis." Id.  In other words, we had been getting the test wrong.

In 1990 we confirmed that the post-Graham test in this circuit is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent and motivation." Samples v. City of Atlanta, 916 F.2d 1548, 1550 (11th Cir. 1990) (quotation marks omitted, emphasis added) (citing Graham, 490 U.S. at 397, 109

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

S. Ct. at 1872). Thereafter, however, we backslid into our old erroneous, sadistic and malicious factor ways. See Hadley, 526 F.3d at 1329 (2008); Slicker, 215 F.3d at 1233 (2000). The error was innocent enough to be understandable but error nonetheless.[8]

When two or more of our cases conflict, we are obligated to follow the earlier one. United States v. Mozie, 752 F.3d 1271, 1285 (11th Cir. 2014); Offshore of the Palm Beaches, Inc. v. Lynch, 741 F.3d 1251, 1256 (11th Cir. 2014) ("[W]hen faced with an intracircuit split, we look to the earliest case not abrogated by the Supreme Court or by this Court sitting en banc."). Our Samples decision predates Slicker and Hadley, so it trumps them on the issue of whether the subjective intent of the officer, specifically whether he acted maliciously and sadistically, is to be considered in a Fourth Amendment excessive force case. It is not to be considered. The test is not a subjective one but asks whether the officer's

---

[8] It began with Moore v. Gwinnett County, 967 F.2d 1495 (11th Cir. 1992), a qualified immunity excessive force case. Moore was decided three years after Graham but it involved an arrest and accompanying force that took place in 1988, a year before Graham was decided. Id. at 1496–97. Along with the objective factors, we considered the "good faith or maliciously and sadistically" subjective-intent factor. Id. at 1498. That was not, however, error in the Moore case because qualified immunity law requires that we judge the officer's conduct in light of the law in effect at the time of that conduct. See, e.g., Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991); Hamm v. Powell, 874 F.2d 766, 771 (11th Cir. 1989). But see Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1559–60 (11th Cir. 1993) (citing Graham and applying only the first three Leslie factors to decide a qualified immunity defense even though the arrest at issue took place in 1988). Under the pre-Graham law that applied at the time of the arrest at issue in Moore, it was clearly established that one of the factors governing an excessive force claim was the officers' subjective intent. See Leslie, 786 F.2d at 1536. We read Moore to be articulating the law that was clearly established at the time of the pre-Graham arrest. We don't read either Slicker or Hadley as doing that.

actions in applying the force were objectively reasonable.  We do not consider whether an officer acted in good faith or sadistically and maliciously.  Graham, 490 U.S. at 397, 109 S. Ct. at 1872; Lee, 284 F.3d at 1198 n.7; Samples, 916 F.2d at 1550.

### B.

We now turn to the question of whether the facts in this case show that the defendants violated Mobley's constitutional rights.  See Pearson, 555 U.S. at 236, 129 S. Ct. at 818.  Mobley contends that Elliott, Johnson, and Yoder[9] violated his rights by using excessive force during his arrest.  He contends that the rest of the officers violated his rights by not stopping Elliott, Johnson, and Yoder from using that force.  See Crenshaw, 556 F.3d at 1293–94 (holding that an officer in a position to intervene is liable for nonfeasance if he does not "take reasonable steps to protect the victim of another officer's use of excessive force").  Mobley concedes that the officers were acting within their discretionary authority when they pursued and arrested him, so to defeat qualified immunity he must first demonstrate an issue of material fact about whether the officers violated his constitutional rights.  See Morton, 707 F.3d at 1280–81.

---

[9] Mobley's brief does not identify these officers by name, but they are the officers who the defendants concede participated in Mobley's arrest.  In his complaint, Mobley identifies Johnson and Yoder as the officers who tased him while he was on the ground.

13

Officers on the scene of Mobley's arrest, responding to Deputy Bronson's alert bulletin, would have known that Mobley was a fleeing suspect who had struck a police officer with his truck and then led police on a reckless, high-speed chase. Those officers would also have seen Mobley wade into the middle of a pond in what they would have reasonably assumed was a continuing attempt to evade capture. Finally, those officers would have seen Mobley refusing to surrender his hands to be cuffed despite the application of escalating force and repeated use of a taser. In those circumstances, striking, kicking, and tasing the resisting and presumably dangerous suspect in order to arrest him were not unreasonable uses of force and did not violate Mobley's constitutional rights. See Saucier v. Katz, 533 U.S. 194, 205, 121 S. Ct. 2151, 2158 (2001), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009) ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed."); Graham, 490 U.S. at 396–97, 109 S. Ct. at 1872 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation."); cf. Crenshaw, 556 F.3d at 1291–92 (use of police dog to aid in capture of suspect was not unreasonable even when dog bit suspect 31 times after suspect, fleeing

14

through a wooded area, "laid on the ground and shouted out his location in an attempt to surrender" but before he was secured in handcuffs).  Mobley now contends that he posed no threat, but he does not point to any facts that would have made it objectively unreasonable for the officers to believe that he did.

In those circumstances, five of the factors we consider from the perspective of a reasonable officer on the scene — severity of the crime, whether the suspect poses an immediate threat to safety, whether he is actively resisting or attempting to evade arrest, the need for the application of force, and the relationship between the need and amount of force used — weigh against Mobley.  See Graham, 490 U.S. at 396, 109 S. Ct. at 1872; Lee, 284 F.3d at 1198.  The only factor on which Mobley has alleged facts arguably in his favor is the extent of injury inflicted.  See Lee, 284 F.3d at 1198.  Mobley contends that he suffered a broken nose, broken teeth, cuts, bruises, and ongoing psychological damage from the officers' actions during his arrest.  Those alleged injuries are certainly not trivial.  But as we have pointed out, "the typical arrest involves some force and injury."  Reese, 527 F.3d 1272.  When more force is required to effect an arrest without endangering officer safety, the suspect will likely suffer more severe injury, but that alone does not make the use of that amount of force unreasonable.  (If it did, deadly force could never be used no matter what the circumstances were.)  Even assuming, as we must at the summary judgment stage, that Mobley's alleged  injuries did not occur

15

when he wrecked his truck, the injuries he suffered were not disproportionate to the force that the officers reasonably could have believed was required to subdue him.

The decisions Mobley relies on to demonstrate that the officers used excessive force are not on point.  In Slicker, 215 F.3d at 1233, the plaintiff was already arrested and in handcuffs when "officers kicked him in the ribs and beat his head on the ground."  In Reese, 527 F.3d at 1272–74, we concluded that because the defendant officer lacked probable cause to make an arrest he was "not justified in using any force against Reese."  (Emphasis added.)  Under those circumstances, we held that even de minimis force would have been unreasonable.  Id.  Also, in the Reese case the plaintiff was accused of only a minor misdemeanor "for which less force is generally appropriate."  Id. at 1274.  Similar circumstances existed in Lee, 284 F.3d at 1198, in which the plaintiff was accused of nothing more than  "honking [her] horn on a busy downtown thoroughfare" and, upon being stopped, did not "actively resist[] or attempt[] to flee."  The defendant officer nonetheless "slammed her head against the trunk [of her car] after she was arrested and secured in handcuffs."  Id.  And in Smith v. Mattox, 127 F.3d 1416, 1419–20 (11th Cir. 1997), we premised our conclusion that force was excessive in a "very close case" on the basis that the plaintiff "was offering no resistance at all" to having his hands cuffed.

16

Mobley, by contrast, was being arrested for (and was later convicted of) the serious crime of assaulting a police officer with a deadly weapon. See Reese, 527 F.3d at 1274; Lee, 284 F.3d at 1198. And Mobley concedes that he had refused to surrender his hands, unlike the plaintiff in Smith. See 127 F.3d at 1419–20. Unlike the plaintiffs in Slicker and Lee, Mobley admits that the officers did not apply any force after he finally surrendered his hands to be cuffed. See 284 F.3d at 1198; 215 F.3d at 1233. Our decisions demonstrate that the point at which a suspect is handcuffed and "pose[s] no risk of danger to the officer" often is the pivotal point for excessive-force claims. We have held a number of times that severe force applied after the suspect is safely in custody is excessive. See Galvez v. Bruce, 552 F.3d 1238, 1243 (11th Cir. 2008); Lee, 284 F.3d at 1198; Slicker, 215 F.3d at 1233.

But force applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive. See Crenshaw, 556 F.3d at 1294; cf. Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir. 2008) (use of taser on a handcuffed suspect was not excessive when officer reasonably believed that suspect "who ha[d] repeatedly ignored police instructions and continue[d] to act belligerently toward police" was spitting blood on him). Mobley has not pointed to any circumstances before he quit resisting and was handcuffed that show the force applied against him

17

was objectively unreasonable. Deputies Yoder, Johnson, and Elliott therefore are entitled to summary judgment on the ground of qualified immunity because under the circumstances their conduct did not violate Mobley's constitutional rights.[10]

Summary judgment is also appropriate for the remaining officers who did not participate directly in the arrest because a police officer has no duty to intervene in another officer's use of force when that use of force is not excessive. See Crenshaw, 556 F.3d at 1294 (noting that when an officer "did not violate [the suspect]'s right to be free from excessive force," his partner "had no attendant obligation to intervene").

The district court did not err in granting summary judgment in favor of the officers.

### III.

For these reasons, we **DISMISS** as moot appeal no. 13-11972, in which Mobley challenges the March 15, 2013 order dismissing his original complaint.   In appeal no. 13-15726, we **AFFIRM** the October 1, 2013 order granting summary judgment in favor of the officers on his amended complaint.

---

[10] Because we hold that the officers did not violate Mobley's Fourth Amendment right to be free from excessive force during his arrest, we need not decide whether they would be entitled to qualified immunity even if they had done so.  See Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009); Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009).