[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14186
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-22800-MGC


CORDARIUS BENJAMIN,

Plaintiff - Appellee,

versus

CITY OF MIAMI,

Defendant,

YAMIR BORREGO,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(April 6, 2018)

Before JULIE CARNES, JILL PRYOR and HULL, Circuit Judges.

PER CURIAM:

Yamir Borrego, a detective with the City of Miami Police Department, appeals the district court's order denying his motion to dismiss based on qualified immunity Cordarius Benjamin's Fourteenth Amendment substantive due process claim under 42 U.S.C. § 1983.[1]  After careful review, we reverse.

I.

Benjamin's second amended complaint arose out of his arrest for an armed robbery he did not commit.[2]  Three men robbed Wilmer Fonseca and his 12 year old stepdaughter in front of their home in Miami, Florida.  Fonseca's stepdaughter immediately called the police and provided a description of the assailants.  Police officers arrived on the scene and began investigating.

About an hour and a half after the robbery, while still in the neighborhood searching for the assailants, officers spotted Benjamin, a high school student on summer break, walking a few blocks away from Fonseca's home.  The "officers approached [Benjamin] with their guns drawn and ordered him to lay face-down in

---

[1] Benjamin also sued the City of Miami.  The district court dismissed those claims—some with prejudice and some without prejudice—and Benjamin has not appealed from that decision.  Accordingly, we address no claims against the City of Miami.

[2] Because the district court decided this case at the motion to dismiss stage, we accept the facts alleged in Benjamin's second amended complaint as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  We thus recite the facts as Benjamin alleged them.

2

the street." Second Am. Compl., Doc. 38 at 3.[3] The officers explained to Benjamin that he "fit the description of a robbery suspect and that they were going to transport him for a 'show up.'" *Id.*

At the show-up, Fonseca told the officers that Benjamin was not involved. Fonseca's stepdaughter, however, "claimed that [Benjamin] 'looked similar' to one of the robbers." *Id.* at 4. With this information, the officers transported Benjamin to the police station for an interview. While en route to the station, Benjamin asked his friend Stanley to contact someone in Stanley's guardian's law firm to represent him. Stanley called Hilton Napoleon, II, Esq., and told Napoleon that Benjamin "had been transported to the police station and requested an attorney." *Id.* Importantly, Benjamin did not allege that he ever told police of the call or that he wanted an attorney.

As alleged in the second amended complaint, Napoleon then sought to initiate contact with Benjamin and to prevent police from interviewing his prospective client without his presence. Napoleon "called the Miami Police Department Robbery Bureau and told them not to speak to [Benjamin] without his presence" and that he soon would be at the station. *Id.* "Detective Borrego answered the phone call from Napoleon and lied and told him that the interview had already commenced (which it had not), and that they planned to continue it, so

---

[3] "Doc. #" refers to the entry on the district court docket.

3

long as [Benjamin] agreed to speak." *Id.* at 5 (footnote omitted). In fact, Benjamin's interview began more than an hour after Napoleon spoke with Borrego on the phone. Borrego refused to notify Benjamin that Napoleon was on his way, telling Napoleon, "[i]t's your client's decision to speak to us, not yours." *Id.*

Napoleon again was rebuffed when he reached the station. Police at the station told Napoleon that Benjamin's interview had ended and that Benjamin was being transported to jail but, according to the second amended complaint, "[t]hat also was a lie" because Benjamin was still at the station and not interviewed until "almost one hour *after* Napoleon arrived at the station." *Id.* Napoleon made repeated additional requests to speak to or see Benjamin or discuss the matter with a member of the robbery unit, but his attempts were unsuccessful.

Borrego obtained a *Miranda*[4] waiver and interviewed Benjamin. After the interview, Benjamin was arrested, booked, and charged with two counts of armed robbery, a non-bondable offense. He remained jailed for 15 days and thereafter was required to wear an ankle monitor for a period.

As relevant here, Benjamin alleged that Borrego violated his right to due process when he misadvised him of his right to counsel, refused to notify him that Napoleon was present at the police station and wanted to speak with him, and lied to Napoleon about his potential client's interrogation and whereabouts. Borrego

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

moved to dismiss on the ground of qualified immunity, and, after a hearing, the district court denied the motion, concluding that the second amended complaint sufficiently alleged that Borrego's conduct amounted to a denial of Benjamin's clearly established constitutional right to due process. Borrego timely filed this interlocutory appeal.

## II.

"Once the affirmative defense of qualified immunity is advanced[,] unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (alteration and internal quotation marks omitted). "We review de novo a district court's decision to grant or deny the defense of qualified immunity on a motion to dismiss, accepting the factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Davis v. Carter*, 555 F.3d 979, 981 (11th Cir. 2009) (internal quotation marks omitted).

## III.

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Cottone*, 326 F.3d at 1357

(internal quotation marks omitted).[5] To demonstrate that an official performing a discretionary function is not entitled to qualified immunity, "the plaintiff must demonstrate (1) that the facts show that the official violated the plaintiff's constitutional rights and (2) that the law clearly established those rights at the time of the alleged misconduct." *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1352-53 (11th Cir. 2015) (internal quotation marks omitted). "We may address those two inquiries in either order." *Id.* at 1353.

Without addressing whether a constitutional violation occurred, Borrego argues that Benjamin failed to assert a violation of clearly established federal law. We agree. A plaintiff may establish a due process violation under the Fourteenth Amendment stemming from a law enforcement officer's conduct only if that conduct "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Benjamin raises two cases as clearly establishing that Borrego's conduct shocks the conscience, *Moran v. Burbine*, 475 U.S. 412 (1986), and *Haliburton v. State*, 514 So. 2d 1088 (Fla. 1987). But neither does.

In *Burbine*, the Supreme Court addressed a due process claim on facts somewhat similar to the facts alleged in this case. Police arrested Brian Burbine for a burglary and transported him to the police station. *Burbine*, 475 U.S. at 416-17. Police suspected that Burbine also had been involved in a murder and intended

---

[5] Borrego indisputably was performing a discretionary function when he allegedly interfered with Napoleon's attempts to access Benjamin.

6

to question him regarding the crime. *Id.* at 416. Burbine's sister, unbeknownst to Burbine, contacted the Public Defender's Office to obtain legal assistance for her brother. *Id.* A public defender who answered one of these telephone calls then called the police department, confirmed Burbine's presence at the station, and told a detective that she would act as Burbine's counsel in the event the police intended to question him. *Id.* at 417. The detective told the public defender that Burbine would not be questioned that night, but in fact Burbine was subjected to "a series of interviews" during which he executed a series of *Miranda* waivers. *Id.* Burbine asserted that the detective's interference with his communications with the public defender violated his rights under the Due Process Clause. The Supreme Court held that, "on these facts, the conduct falls short of the kind of misbehavior that so shocks the sensibilities of civilized society" as to constitute a due process violation, although it noted "that on facts more egregious than those presented here police deception might rise to a level of a due process violation." *Id.* at 432-34.

It is this statement, Benjamin argues, that clearly establishes the constitutional violation in his case, which, he says presents "facts more egregious" than those in *Burbine*. *Id.* Setting aside whether the facts of this case are more egregious than those in *Burbine*, however, the suggestion in *Burbine* that worse facts might run afoul of the Due Process Clause cannot clearly establish the fact of a due process violation in this case. "The clearly established standard . . . requires

7

that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him.  The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (internal quotation marks omitted).  *Burbine* set forth no "rule" for officers to follow; thus, it cannot clearly establish Benjamin's due process right in this case.

In *Haliburton*—which also concerned facts similar to this case—the Florida Supreme Court held that it is a violation of "the due process provision of article I, section 9, of the Florida Constitution" when a police officer "fail[s] to notify [an individual] that an attorney was present and requesting to see him."  514 So. 2d at 1089-90.  The court in *Haliburton* expressly characterized its holding as "a matter of state law" only.  *Id.* at 1090.  Federal courts may rely on a state court decision to decide whether a plaintiff has demonstrated a violation of his clearly established rights.  *See Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009) (considering Florida courts' decisions regarding probable cause to arrest in analyzing § 1983 claim based on alleged violation of Fourth and Fourteenth Amendments).  But for this reliance to be proper, the state court decision must pertain to a violation of *federal* law.  *See id.*; *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) ("The purpose of [qualified] immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation,

8

protecting from suit all but the plainly incompetent or one who is knowingly violating the *federal* law." (emphasis added) (internal quotation marks and citation omitted)). Since *Haliburton*'s due process holding was expressly confined to state law, it cannot clearly establish a federal due process right.

We do not condone the conduct alleged in this case. Nevertheless, because Benjamin's second amended complaint did not allege the violation of a clearly established federal right, Borrego's motion to dismiss based on qualified immunity should have been granted. *Cottone*, 326 F.3d at 1357.

## IV.

For the foregoing reasons, we reverse the district court's denial of Borrego's motion to dismiss Benjamin's claim that he was denied his right to due process when Borrego interfered with Napoleon's attempts to contact him.

**REVERSED.**